City of Pittsburgh, Peter F. Flaherty, Mayor and Public Safety Director, and Robert Colville, Superintendent of Police, Appellants, v. William J. Cavanaugh, Walter Gelik and Robert Smolensky, Appellees.

Argued May 6, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*D. R. Pellegrini*, Assistant City Solicitor, with him *Mead J. Mulvihill, Jr.*, City Solicitor, for appellants.

*Peter J. Mansmann*, for appellees.

OPINION BY JUDGE WILKINSON, June 2, 1975:

Appellees are police officers who were assigned to clerical duties in the Service Branch of the Pittsburgh Bureau of Police. In November, 1971, the City of Pittsburgh and the bargaining unit to which appellees belonged became subject to an arbitration award covering the period from January 1, 1972, through December 31, 1972. This arbitration award provided, in part:

"5. The members of the unit shall receive time and one-half of their regular pay for all hours worked in excess of eight (8) hours per day or forty (40) hours per week.

"6. All other conditions of work and benefits not in conflict with this Award shall continue as presently in force."

On February 28, 1972, appellant Superintendent of Police issued a new work schedule directive which stated, in part:

"Effective March 1, 1972, all Civilian and Police Personnel assigned to clerical duties will be scheduled from 8:00 A.M. to 4:45 P.M. with 45 minutes for lunch."

Prior to the effective date of this directive, appellees worked from 8:00 a.m. to 4:00 p.m. Although appellees were on duty and were paid for the entire eight hours, they were permitted to take a lunch break. No set amount of time was provided for this break, but it is clear that appellees were permitted to leave the building. On cross examination, appellant Superintendent of Police testified as follows:

"Q. I think the whole issue here is, did these men before March 1, 1972 work from 8:00 to 4:00 and take their lunch period during that period whether in the building or out of the building?

"A. Prior to that time, the men worked 8:00 to 4:00, took their lunch period.

"Q. Wherever they chose?

"A. Wherever they chose."

And when examined by the court:

"Q. But the general practice was that during that 8:00 to 4:00 period if a man chose he left the building and went out and had lunch and then came back, is that right?

"A. Right.

"Q. Or on other occasions, he might have his lunch while he was doing his duties or he might simply have his lunch at his desk while not performing any duties?

"A. Yes, that would be correct."

After the directive went into effect, appellees continued to work as they had prior to March 1, with the exception that they worked until 4:45 p.m. rather than 4:00 p.m. They submitted overtime vouchers for the additional 45 minutes per day which appellants refused to accept. Appellees contend that the directive changing the work schedule was a change in the existing conditions of work, and since it was not negotiated and agreed to by the bargaining unit, it was in violation of paragraph 6 of the above quoted arbitration award.

It is abundantly clear to us, from the quoted testimony and from the remainder of the evidence, that the long-standing practice of working a straight eight-hour shift with lunch "on the run" was changed by the March 1 directive, with the practical effect of lengthening certain police officers' working day by 45 minutes. We agree with the court below that this was a unilateral change in a condition of work and as such, violated the arbitration award.

We also agree that appellees are entitled to be paid for the 45 minutes overtime they were required to work each day. Although there is conflicting testimony on this point, appellants argue that another longstanding practice in the Bureau of Police was that overtime would not be paid unless the time worked was in excess of one hour and that, therefore, they need not pay for 45 minutes. This argument is without merit for several reasons, not

the least of which is that it is contra to the arbitration award. Paragraph 6 of the award only continues such conditions of work and benefits then in effect, which did not conflict with the award. Although such a practice may have been in effect at the time the award was negotiated, it is in head-on conflict with paragraph 5 of the award.

Affirmed.